```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
JONAH SEEMAN,

                Plaintiff,             OPINION

        -against-
                                       08 Civ. 9163 (MGC)

GRACIE GARDENS OWNERS CORP.
AND COOPER SQUARE REALTY
INC.,

                Defendants.

----------------------------------X

APPEARANCES:

        MICHAEL G. O'NEILL LAW OFFICE
        Attorneys for Plaintiff
        30 Vesey Street, Third Floor
        New York, New York 10007

        BY: Michael G. O'Neill, Esq.
            Elizabeth Crow, Esq.



        CANTOR, EPSTEIN & MAZZOLA, LLP
        Attorneys for Defendants
        49 West 37th Street
        New York, New York 10018

        BY: Bryan J. Mazzola, Esq.
            Rachael Gurlitz, Esq.
```

**Cedarbaum, J.**

Plaintiff Jonah Seeman brings this action against defendants Gracie Gardens Owners Corp., the residential cooperative that employed him for forty years, and its managing agent, Cooper Square Realty Inc.  The complaint alleges that defendants took various adverse employment actions against Seeman because of his mental disability. Seeman claims violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; the New York State Human Rights Law, New York State Executive Law § 290, et seq.; and the New York City Human Rights Law, New York City Administrative Code § 8-101, et seq.  In addition to these discrimination claims, Seeman asserts violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and the New York Labor Law, N.Y. Lab. L. § 650 et seq., for failure to pay overtime.

Defendants have moved for summary judgment dismissing the complaint.  For the reasons that follow, the motion is granted.

## BACKGROUND

This case shares a common background with Seeman's companion suit against Gracie Gardens and his union, discussed in Seeman v. Local 32B-32J, Service Employees

Union, ___ F.Supp.2d ___, No. 09 Civ. 4901, 2011 WL 813771 (S.D.N.Y. Mar. 3, 2011).  Seeman is a 63-year-old man who has been diagnosed with a developmental disorder.  Despite his limitations, he worked for over forty years as a doorman in an apartment building owned by Gracie Gardens and managed by Cooper Square Realty.  His job required him to monitor people entering and leaving the building, assist residents, log visitors and packages into a log book, and respond to emergencies.  Over the course of his entire tenure at Gracie Gardens, Seeman neither required nor requested any accommodation for diminished mental capacity.

On December 4, 2007, following various complaints about Seeman's body odor and bad breath, Seeman received a one-day suspension from work ("the 2007 suspension").  The following week, Seeman visited a dental clinic.  A dentist at the clinic reported that Seeman exhibited an "offensive smell" believed to be body odor from Ketosis, a condition related to Seeman's diabetes.

On February 8, 2008, Seeman was suspended again, this time because his locker had become infested with bedbugs ("the 2008 suspension").  Seeman's residence, which he shared with his elderly mother, turned out to be similarly bug-ridden. Gracie Gardens prohibited Seeman from returning to work until he could confirm that his residence had been

inspected, treated, and certified by a licensed examiner as free of bedbugs.

Because of the infestation, however, Seeman and his mother had already signed a lease for a new apartment and purchased new furniture. Seeman attempted to satisfy Gracie Gardens' demands by proving that he and his mother had moved to a new, bedbug-free apartment. To that end, he provided Gracie Gardens with copies of the lease for the new apartment, a receipt showing the purchase of new furniture, and a receipt from an exterminator confirming that the new apartment was clean of bedbugs. Gracie Gardens, which had not been advised that Seeman was moving to a new apartment when it issued the 2008 suspension, refused to reinstate him. Instead, it demanded that Seeman produce an exterminator's inspection of not only his new apartment, but also the apartment in which he had previously been living. Because Seeman had already vacated his previous apartment, he was unable to meet this demand, and remained suspended.

On February 27, 2008, Seeman's mother drafted a letter of resignation for her son. It stated in relevant part:

> I am writing this letter to let you know that after 41 years of service, I have to retire so I can take care of my mother who is 81 years old and can not take care of herself. Please send

>     all the pay that is coming to me including my pay
>     for 5 weeks vacation.
>
>     Thank you very much it was very nice working for
>     you.

Seeman read the letter, signed it, and mailed it to Gracie Gardens.  According to the deposition testimony of both Seeman and his mother, Seeman resigned because his mother did not want him to return to work.

On March 6, 2008, Gracie Gardens accepted Seeman's resignation.  It also issued him payroll checks for his accrued vacation and sick leave, one personal day, and the one-day 2007 suspension, all of which Seeman cashed.  After this, Seeman applied for his pension benefits.

Over a month later, Seeman signed a letter that his brother had drafted rescinding the resignation.  Yet despite signing the rescission letter, Seeman testified at his deposition that he actually had no interest in returning to work and preferred instead to stay home and care for his mother.  Gracie Gardens received the rescission letter on May 5, 2008.

On May 1, 2008, Seeman filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC").  After the EEOC dismissed that charge, Seeman commenced this federal action.

**DISCUSSION**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists when the evidence is such that a reasonable finder of fact could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  In deciding whether a genuine dispute exists, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).

**I.  Discrimination claims**

Section 102(a) of the ADA, codified at 42 U.S.C. § 12112(a), prohibits disability-based employment discrimination.  Claims under this statute are subject to the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), for workplace discrimination claims under Title VII of the Civil Rights Act of 1964.  Reg'l

Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002).  Within that framework, a plaintiff must first establish a prima facie case by showing "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008).

If the plaintiff makes out a prima facie case, then the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision. Reg'l Econ. Cmty. Action Program, 294 F.3d at 49.  If the defendant carries that burden, "the McDonnell Douglas framework . . . disappear[s] and the sole remaining issue [is] discrimination vel non." Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000)) (alterations in original).  The plaintiff must then produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).   That

7

evidence must be sufficient "to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." Id. (internal brackets and quotation marks omitted).

The complaint in this case alleges two adverse employment actions that could provide a basis for a discrimination claim: the 2007 suspension, which lasted for one day, and the 2008 suspension, which lasted until Seeman tendered his resignation. The evidence, however, does not support a finding that defendants issued either of these suspensions because of Seeman's mental condition. Even assuming arguendo that Seeman has carried his minimal burden of establishing a prima facie case, he has still produced no evidence to suggest that defendants' proffered nondiscriminatory reasons for their actions were pretextual.

A.  The 2007 Suspension

Defendants' stated reason for the 2007 suspension was their dissatisfaction with Seeman's personal hygiene. At different points, they identified the problem as either bad breath or body odor. There is nothing to suggest that this

8

reason was fabricated or that the real reason was probably Seeman's disability. Prior to the suspension, several building residents had complained about Seeman's odor. A dentist examining Seeman noticed an "offensive smell," which the dentist believed to be body odor related to diabetes. Other members of the coop staff, who were interviewed by an investigator from Seeman's union after the suspension, also complained about Seeman's smell and overall hygiene.

Seeman notes that the residents' complaints came exclusively from board members, rather than from residents who did not sit on the board. That only board members complained, Seeman contends, could suggest that the board was trying to oust Seeman and needed to invent a false pretext for doing so. Yet there is nothing remarkable in the fact that the members of a coop board might take a more active interest than other residents in the coop's daily affairs. Moreover, although other residents may not have complained, Seeman's coworkers did. It cannot be plausibly inferred from these facts that the board members were seeking to hide their true motivation.

Seeman also argues that defendants' discriminatory motive could be inferred from the statements of two doormen, each of whom has submitted a declaration on

Seeman's behalf. These doormen, one of whom works in Gracie Gardens and the other of whom works in a different building, state that they have never before heard of a doorman being disciplined for bad breath and that, therefore, they believe that defendants were simply looking for an excuse to get rid of Seeman. But the declarants do not identify any other doorman with a noticeable odor issue. There is therefore no factual basis on which to conclude that defendants would treat any other malodorous doorman differently from Seeman. The declarants' naked opinion unsupported by evidence does not create a genuine dispute as to a material fact.

B.   The 2008 Suspension

Similarly, none of the evidence suggests that defendants issued the 2008 suspension for any purpose other than their legitimate concern about bedbugs. According to the complaint, defendants concocted the bedbug story as a false pretext for the 2008 suspension, which was actually motivated by discrimination against Seeman on account of his mental impairment. The complaint alleges that, although Seeman could not have been responsible for any bedbugs in the employee locker room, his was nonetheless the only locker to be inspected for bedbugs. The complaint

10

further alleges that Gracie Gardens refused to reinstate Seeman from the 2008 suspension unless he moved out of his apartment and bought a new wardrobe. Contending that these conditions would be too onerous for a reasonable person to bear, the complaint brands them a "de facto termination."

Discovery has shown many of these allegations to be inaccurate. It is undisputed that the bedbug inspector examined the entire locker room and found bedbugs and bedbug eggs only in Seeman's locker. It is also undisputed that Seeman's residence had been infested with bedbugs for a month before his locker was inspected. Finally, it is undisputed that Seeman changed his residence and purchased new clothing because of the bedbug infestation, not because defendants demanded it as a condition of reinstatement. The evidence shows that Seeman signed a lease for a new apartment three days before the locker room was even inspected.

The complaint's characterization of the 2008 suspension as a de facto termination is contradicted by Seeman's own deposition testimony. He testified repeatedly that he voluntarily resigned in order to honor the wishes of his mother, who did not want him to return to work. This is consistent with the language of the resignation letter itself, which attributes the decision to the desire

11

to "take care of my mother who is 81 years old and cannot take care of herself." He also denied that his resignation was in any way procured by force or trickery. Although plaintiff's counsel now attempts to discredit that testimony through his Local Rule 56.1 counterstatement of facts and his memorandum in opposition to defendants' motion for summary judgment, it is well settled in this circuit that a party may not create an issue of fact by contradicting his prior deposition testimony. E.g., Brown v. Henderson, 257 F.3d 246, 256 (2d Cir. 2001); Bickerstaff v. Vassar College, 196 F.3d 435, 455 (2d Cir. 1999); Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997); Batac v. Pavarini Construction Co., Inc., 216 F. App'x 58, 60 (2d Cir. 2007). There is no genuine dispute that Seeman resigned voluntarily.

Seeman testified that he himself did not believe that defendants were motivated by disability-based discrimination. When asked during his deposition whether he believed defendants imposed their conditions of reinstatement in order to be "mean" to Seeman, he testified "No. No. No." Seeman Dep. 188:12-14, May 7, 2010. When asked whether he believed, instead, that defendants were acting out of caution, he testified "Yes. Yes." Id. at 188:15-17.

Seeman's counsel tries to discredit his client's testimony, just as he tried to discredit Seeman's testimony concerning his motivation for resigning.  Again, however, a plaintiff may not escape his sworn deposition testimony, especially when that testimony refutes the factual basis of the claim.  In <u>Brown v. Henderson</u>, the Second Circuit granted summary judgment dismissing the claim of a sexual harassment plaintiff who stated in an affidavit that she was harassed because she was a woman.  She had previously testified at a deposition that she was harassed purely because of her role in a union election.  257 F.3d at 256.  Refusing to allow her to "rescue her claim with a last-minute conversion" to a position at odds with her prior deposition testimony, the Court held that the plaintiff failed to show sexual harassment as a matter of law.  <u>Id.</u>

Seeman's counsel attempts to make the same sort of about-face that <u>Brown</u> proscribed.  He argues for the first time that Seeman's mental condition prevents him from understanding abstract concepts such as discrimination.  Yet whatever Seeman's mental faculties, he signed an EEOC charge and a complaint premised entirely on allegations of discrimination.

In any event, the rest of the factual record is consistent with Seeman's deposition testimony that

13

disability had nothing to do with defendants' decision to issue the 2008 suspension.  Apparently, Seeman's counsel no longer claims otherwise.  Instead, he proffers a new theory that does not appear in either the EEOC charge or the complaint.  The new theory is that Seeman complied with defendants' original conditions for reinstatement, after which defendants added new and unreasonable demands in an effort to ensure that Seeman would not return to work.  Under this new theory of liability, it was defendants' imposition of the additional conditions for reinstatement that was motivated by discrimination, notwithstanding the legitimacy of the original conditions or the 2008 suspension itself.  The imposition of those additional conditions, Seeman now argues, is the adverse employment action that defeats summary judgment.

Allowing Seeman to proceed on this new theory of liability would effectively amend the complaint at the summary judgment stage. "An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims."  Lyman v. CSX Transp., Inc., 364 F. App'x 699, 701 (2d Cir. 2010) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1183, at 23 n.9 (3d ed. 2004)).  The only adverse employment actions properly before the Court are the ones submitted to the

14

EEOC and set forth in the complaint.  Accordingly, it is defendants' motivation for issuing the 2008 suspension, rather than their motivation for refusing Seeman's request to be reinstated from that suspension, that is at issue in this case.[1]

Although the refusal-to-reinstate theory of discrimination is not properly before the Court, the evidence proffered in support of that theory could still have relevance if it could substantiate the theory of discrimination alleged in the complaint.  Consideration of that evidence is therefore appropriate.  Seeman attempts to draw a negative inference from the fact that all of defendants' witnesses deny any knowledge that he had a mental disability, while other doormen and Seeman's family members believe his disability is a matter of common knowledge.  That defendants consistently disclaim knowledge

---

[1] Moreover, even if the board's refusal to reinstate Seeman were at issue, it would not affect the disposition of defendants' motion.  The evidence establishes that the board, which at the time it issued the 2008 suspension was not aware that Seeman was changing residences, sought additional information in order to ensure that Seeman could not inadvertently transport bedbugs from the old apartment to the new.  All of the additional documentation that the board requested or considered requesting related to the likelihood of re-infestation or the truth of Seeman's statement that he was moving out of his old apartment.  None of defendants' post-suspension actions suggests pretext.

of something known to others, Seeman argues, suggests that they are trying to cover up their own liability.  This is not a plausible inference.  All this fact shows is that people had different opinions about Seeman's mental capacity.  Indeed, Seeman's own expert witness testified at his deposition that the disability would only be apparent to observers during particular kinds of verbal interactions.  No reasonable jury could find that the testimony of defendants' witnesses evidenced a cover up.

Seeman also points to his sister's testimony that, at some point between 2007 and 2008, Gracie Gardens' building manager told her that Gracie Gardens did not want "your brother's kind" working in the building.  The building manager never elaborated on what he meant by this, but Seeman's sister interpreted the remark as a reference to Seeman's disability and Jewish religion.  The relevant interpretation is not hers, however, but that of a reasonable jury.  As a matter of law, "the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) (citing Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir. 1994)).  Because there are no other indicia of discrimination in this case, a reasonable jury could not

16

find for Seeman based solely on the building manager's comment.  See id. at 470 (holding that defendant's comments referring to plaintiffs as "contaminated" and "Bad Apples" were insufficient to establish that defendant's stated nondiscriminatory rationale was pretextual).

The state and municipal discrimination claims in this case rise or fall with the merits of the ADA claim. Although federal discrimination law diverges from state and local law on the scope of a covered disability, their standards for liability are otherwise the same.  See Ferraro v. Kellwood Co., 440 F.3d 96, 99–100 (2d Cir. 2006).

## II.  Labor law claims

The complaint also asserts that defendants violated the FLSA and related state law by failing to pay Seeman overtime for the extra hour of work that he performed every day since 2000.  The FLSA covers only those employees who are either "engaged in commerce or in the production of goods for commerce" or are "employed in an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 207(a)(1).[2]  The complaint does not

---

[2] "Commerce" is defined as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."  29

contain any facts suggesting that Seeman is engaged in commerce or produces goods for commerce, nor does it allege any facts suggesting that Seeman is employed in an enterprise that does so.  Instead, it alleges only that Seeman worked as a doorman, that Gracie Gardens owns and operates a residential building, and that Cooper Square Realty is employed by Gracie Gardens as its managing agent.

Recognizing the complaint's silence on this element of his FLSA claim, Seeman asks the Court to grant leave to amend the complaint.  This is not the first such request.  On December 1, 2010, shortly before this motion for summary judgment was filed, I denied a separate motion to amend the complaint to include allegations that were known to the plaintiff from the start of this action.  Plaintiff has not identified any justification for amending the complaint to add new allegations after all discovery has been completed and a motion for summary judgment has been filed. As the Second Circuit has observed: "The burden is on the party who wishes to amend to provide a satisfactory explanation for the delay, and the court is free to conclude that

---

U.S.C. § 203(b).  An enterprise is "engaged in commerce" if it "has employees engaged in commerce or in the production of goods for commerce, or . . . has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" and its "annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1).

ignorance of the law is an unsatisfactory excuse." <u>Cresswell v. Sullivan & Cromwell</u>, 922 F.2d 60, 72 (2d Cir. 1990) (internal citation omitted).

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The only remaining claim is a pendent state law claim for overtime violations. Since all federal claims are dismissed, I exercise my discretion to dismiss this pendent state law claim without prejudice to its being filed in state court. <u>See</u> 28 U.S.C. § 1367(c)(3); <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726–27, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966). The Clerk is directed to close this case.

SO ORDERED.

Dated:   New York, New York
         June 27, 2011

                                    S/_____
                                       MIRIAM GOLDMAN CEDARBAUM
                                       United States District Judge